SAMPIE ADAMS, Employee, Plaintiff v. METALS USA, Employer, AMERICAN HOME ASSURANCE/AIG CLAIMS SERVICES, INC., Carrier, Defendants

No. COA04-177

(Filed 15 February 2005)

**1. Workers' Compensation— causation—expert testimony**

The Industrial Commission did not err in a workers' compensation case by concluding that there was competent evidence that plaintiff's injury was caused by his employment, because: (1) the pertinent doctor testified that the development with plaintiff's symptoms was consistent with the injury occurring from plaintiff's fall from a truck ladder at work, and although a disc herniation can be caused by everyday activities, he had no indication that everyday activities caused plaintiff's disc herniation; (2) the doctor's testimony, combined with the additional evidence in the case, provided competent evidence which supports the Commission's finding with respect to causation; (3) although the doctor testified that he could not opine to a reasonable degree of medical certainty whether the fall from the ladder caused plain-

tiff's back injury, the degree of the doctor's certainty goes to the weight of his testimony; and (4) the decision concerning what weight to give expert testimony is a duty for the Commission and not the Court of Appeals.

## 2. Workers' Compensation— ongoing disability—suitable employment

The Industrial Commission did not err in a workers' compensation case by concluding that there existed sufficient evidence to prove ongoing disability, because: (1) from the evidence presented, plaintiff was still currently disabled as he had not yet regained his preinjury wage capacity; (2) defendants have not shown suitable employment opportunities are available to plaintiff who worked as a truck loader for several years and has few transferable skills and limited education; and (3) plaintiff testified that he searched for employment but was unsuccessful.

Judge TYSON dissenting.

Appeal by defendants from opinion and award filed 19 September 2003 by the North Carolina Industrial Commission. Heard in the Court of Appeals 14 October 2004.

*R. Steve Bowden & Associates, by Jarvis T. Harris, for plaintiff-appellee.*

*Robinson & Lawing, L.L.P., by Jolinda J. Babcock, for defendants-appellants.*

BRYANT, Judge.

Metals USA (employer) and American Home Assurance/AIG Claims Services, Inc. (carrier), collectively defendants, appeal an opinion and award of the Full Commission granting plaintiff temporary total disability benefits.

At the time of the hearing before the deputy commissioner, plaintiff, a married forty-seven-year old father of two children had a work history as a laborer. Plaintiff had worked for the defendant-employer as a truck loader since October 1995.

On 1 October 2000, after loading a truck with steel, plaintiff slipped while climbing down a ladder on the truck. Moisture on the bottom of his shoes and on the steps of the ladder caused him to slip and fall. Plaintiff testified at the hearing before the deputy commis-

sioner that the trucks were kept outside and some were covered and others were uncovered. During his fall, plaintiff skinned his arm and fell on his hip as he attempted to catch himself. Immediately, after the fall, plaintiff felt some pain and discomfort in his legs, hips and foot; however, he continued to work notwithstanding the pain.

Plaintiff mentioned the fall to his co-worker, Corey Wiseman who was the punch press operator that evening. Corey Wiseman testified at the hearing that plaintiff told her that he fell off the ladder and showed her the scrapes on his arm.

Even though plaintiff minimized the injury, he reported the incident to Larry Mallotte, the lead man on the third shift, and showed Mallotte the abrasions on his arm because he thought he was supposed to tell someone in case the injury became more serious. Plaintiff testified that at the time he reported the injury to Mallotte, his arms were hurting and he felt like he bruised his hip.

Michael Wiseman, another co-worker, testified during his deposition that during a shift change on or about 1 October 2000, plaintiff told him that he had fallen down a ladder. Michael Wiseman asked plaintiff if he had reported the injury to Mallotte. Michael Wiseman testified that an employee is supposed to report an injury to whomever is in charge. Plaintiff indicated to Michael Wiseman that he had told Mallotte about the fall.

Mallotte testified at the hearing that plaintiff told him he slipped and fell. Mallotte testified that he remembered this conversation occurring on or about 1 October 2000. Mallotte testified that he is supposed to report an injury to the supervisor if an incident was reported to him, but that he did not complete an injury report because plaintiff did not indicate he was seriously injured.

Plaintiff did not seek medical treatment immediately following the injury. He continued to perform his regular job; however, he noticed an increase of pain and discomfort in his hip, leg and foot. He thought the problem was related to years of walking on cement floors.

On 18 January 2001, plaintiff sought medical treatment at White Oak Family Physicians from Dr. Robert B. Scott due to severe back pain. Plaintiff stated he could hardly walk and his left foot was going numb. Plaintiff could not recall a specific injury. Dr. Scott diagnosed plaintiff with substantial sciatica and noted that a disc herniation was suspected. Plaintiff was taken out of work for two weeks.

On or about 22 January 2001, plaintiff contacted defendant-employer regarding his back injury and out-of-work status. Plaintiff was referred to Scott Stafford, Regional Human Resources Manager for defendant-employer; and Stafford offered plaintiff some information regarding short-term disability benefits. Stafford did not complete an accident report at that time. Ultimately, plaintiff did not receive any short-term disability benefits due to the work-related nature of his complaints. Stafford testified that if an injury had been reported to a lead man, then the lead man was to go to the supervisor with that information, but such had not been done in this case. Following plaintiff's conversation with Stafford, Stafford made some inquiries of plaintiff's supervisor and others regarding the injury. Stafford also reported the injury to the workers' compensation servicing agent.

On 29 January 2001, plaintiff returned to White Oak Family Physicians for follow-up care of his back pain. Plaintiff stated he was doing better and was no longer having pain during rest; however, he would hurt when he had been up and about for a very long time. Plaintiff also stated that the drive to the doctor's office had caused a slight flare up in the pain. Dr. Scott continued plaintiff's out-of-work status and prescribed Decadron.

Plaintiff was eventually referred to Randleman Medical Center by the defendant-employer, and was seen there on 30 January 2001, for his back pain. Plaintiff reported he had fallen off a ladder and that the pain had really started bothering him. Plaintiff was prescribed 200 mg of Celebrex.

On 1 February 2001, plaintiff returned to Randleman Medical Center for follow-up care of his back pain. An MRI was requested of plaintiff's lumbar spine and the MRI was approved by Stafford and defendant-appellant. On 7 February 2001, plaintiff had an MRI at Southeastern Radiology, which showed that he had degenerative disc disease at L4-L5 and L5-S1. The MRI also showed a dominant finding of a "large leftward disc protrusion/extrusion with moderate to marked neutral neural encroachment."

On 22 February 2001, plaintiff returned to Randleman Medical Center for a follow-up of his back pain. Plaintiff, stating that his back pain was still intense, was referred to Dr. Henry Poole at Microneurosurgical Specialist of Central Carolina.

On 13 March 2001, Dr. Randy O. Kritzer saw plaintiff at Microneurosurgical Specialist. Plaintiff was being evaluated for left

ADAMS v. METALS USA

[168 N.C. App. 469 (2005)]

buttock, hip and leg pain with numbness and tingling. Plaintiff stated that he fell off a ladder at work. Dr. Kritzer noted that plaintiff's reflexes were absent at the knees, the right ankle, and the left ankle. Dr. Kritzer also noted that plaintiff had decreased sensation in the lateral aspect of the left foot. Dr. Kritzer reviewed the MRI scan, which showed a very large disc herniation at L5-S1 on the left. Dr. Kritzer scheduled surgery for later in the month in the event that plaintiff was not improving. On 29 March 2001, plaintiff returned to Dr. Kritzer, electing to proceed with surgery.

On 6 April 2001, plaintiff underwent a lumbar microdiskectomy performed by Drs. Kritzer and Poole. On 9 May 2001, three weeks following surgery, plaintiff was seen at Microneurosurgical Specialist by Dr. Kritzer. Dr. Kritzer noted that plaintiff was doing well and that most of his pre-operative pain had resolved. Plaintiff stated that he was walking a few miles daily without difficulty. Dr. Kritzer stated that he would see plaintiff back in three weeks, and hopefully release him to return to work at that time.

On 6 June 2001, plaintiff complained to Dr. Kritzer that his pains were worsening again. Dr. Kritzer recommended an MRI scan. On 7 June 2001, plaintiff returned to Dr. Kritzer to follow-up on the lumbar scan. Dr. Kritzer stated that his latest scan showed excellent disk removal and no evidence of neural compression. Dr. Kritzer recommended two epidural steroid shots.

On 25 July 2001, plaintiff returned to Dr. Kritzer after receiving two epidural steroid shots, which did not provide any relief. Dr. Kritzer recommended Elavil and planned to see plaintiff back in a month. On 27 August 2001, plaintiff returned to Dr. Kritzer without receiving much relief after taking the Elavil. Dr. Kritzer stated that plaintiff had reached maximum medical improvement, and he would return plaintiff to work in approximately ten days with some lifting limitations and that he would see him in the future on an as-needed basis. During his deposition, Dr. Kritzer indicated he assigned plaintiff an eleven percent (11%) permanent partial disability rating to his back.

On 13 December 2001, plaintiff was presented to Johnson Neurological Clinic by referral from Dr. Scott to be evaluated by Dr. Victor D. Freund. Plaintiff stated that he had done well for roughly one month following the surgery and then had a recurrence of symptoms. Plaintiff also stated that his leg pain had worsened progressively despite having a repeat MRI scan in June 2001, which showed

no recurrent disc herniation; however, there was significant epidural scarring. After reviewing the MRI scans, previous medical history and conducting a physical examination, according to his medical notations, Dr. Freund could see no need for further neurosurgical intervention. Dr. Freund noted that the best option for improvement of living with the symptoms would be treatment through a chronic pain clinic.

This matter came for hearing before a deputy commissioner, and by order filed 30 August 2002, plaintiff's claim for benefits was denied. The deputy commissioner found that plaintiff continued to perform his normal job duties after the 1 October 2000 incident and failed to report any alleged back injury to his supervisors, co-workers, or the human resources manager; plaintiff did not seek medical treatment until three and one-half months after the alleged accident; and plaintiff's claim to Dr. Kritzer, that he suffered back and leg pain since 1 October 2000, was not corroborated by the other credible evidence. Based upon all of these facts, the deputy commissioner found that plaintiff suffered no back injury as a result of the 1 October 2000 fall and denied his claim for benefits. Plaintiff appealed to the Full Commission.

On review, the Full Commission, like the deputy commissioner, found that plaintiff did not immediately seek medical attention after the 1 October 2000 incident and that he continued to perform his normal job duties. The Full Commission, however, found that during this time plaintiff suffered increasing pain in his hip, leg, and foot. The Full Commission then concluded that plaintiff's testimony was credible and that he suffered a compensable injury by accident on 1 October 2000. The Full Commission reversed the opinion and award of the deputy commissioner and granted plaintiff's claim for benefits.

The issues on appeal are whether: (I) the decision of the Full Commission should be reversed because there was insufficient evidence of causation; and (II) plaintiff presented sufficient evidence to prove ongoing disability.

*Standard of Review*

Opinions and awards of the Commission are reviewed to determine whether competent evidence exists to support the Commission's findings of fact, and whether the findings of fact support the Commission's conclusions of law. *See Deese v. Champion Int'l Corp.,* 352 N.C. 109, 114, 530 S.E.2d 549, 552 (2000). In reviewing a workers'

compensation claim, our Court "does not have the right to weigh the evidence and decide the issue on the basis of weight. The Court's duty goes no further than to determine whether the record contains any evidence tending to support the finding[s]." *Adams v. AVX Corp.*, 349 N.C. 676, 681, 509 S.E.2d 411, 414 (1998). If supported by competent evidence, the Commission's findings are binding on appeal even when there exists evidence to support findings to the contrary. *Allen v. Roberts Elec. Contr'rs*, 143 N.C. App. 55, 60, 546 S.E.2d 133, 137 (2001). The Commission's conclusions of law are reviewed *de novo*. *Allen*, 143 N.C. App. at 63, 546 S.E.2d at 139.

I

[1] First, defendants argue that the decision of the Full Commission should be reversed because there did not exist any competent evidence to support the conclusion that plaintiff's injury was caused by his employment. Specifically, defendants seek to undermine plaintiff's evidence by: (1) arguing that Dr. Kritzer did not testify to a reasonable degree of medical certainty, and (2) suggesting that the evidence merely establishes that plaintiff's condition is possibly related to his work injuries and is speculative at best.

The claimant in a workers' compensation case bears the burden of initially proving "each and every element of compensability," including a causal relationship between the injury and his employment. *Whitfield v. Lab. Corp. of Amer.*, 158 N.C. App. 341, 350, 581 S.E.2d 778, 784 (2003). "The quantum and quality of the evidence required to establish prima facie the causal relationship will of course vary with the complexity of the injury itself." *Hodgin v. Hodgin*, 159 N.C. App. 635, 639, 583 S.E.2d 362, 365 (2003). Plaintiff must prove causation by a "greater weight" of the evidence or a "preponderance" of the evidence. *Phillips v. U.S. Air, Inc.*, 120 N.C. App. 538, 541, 463 S.E.2d 259, 261 (1995). Our Supreme Court has also held that in cases involving complicated medical questions, those questions must be addressed by an expert and only an expert can give competent opinion testimony as to the issue of causation. *Click v. Pilot Freight Carriers*, 300 N.C. 164, 167, 265 S.E.2d 389, 391 (1980).[1] Where, as here, medical opinion testimony is required, "medical certainty is not required, [but] an expert's 'speculation' is insufficient to establish

---

1. "[C]ases involving . . . ruptured discs . . . remain 'the anathema of the orthopedic and neurosurgeon,' not only because of the difficulties of treatment but also because '[i]t is . . . extremely difficult at times to sort out the complaints due to injury from those of nontraumatic origin.' " *Click*, 300 N.C. at 168, 265 S.E.2d at 391 (quoting Brooke, *In the Wake of Trauma* 124, 132 (2nd Ed. 1974)).

causation." *Holley v. ACTS, Inc.*, 357 N.C. 228, 234, 581 S.E.2d 750, 754 (2003).[2] The opinion of a physician is not rendered incompetent merely because it is based wholly or in part on statements made to him by the patient in the course of treatment or examination. *Penland v. Bird Coal Co., Inc.*, 246 N.C. 26, 31, 97 S.E.2d 432, 436 (1957).

It is permissible, but not compulsory for a fact-finder to infer causation where a medical expert offers a qualified opinion as to causation, along with an accepted medical explanation as to how such a condition occurs, and where there is additional evidence tending to establish a causal nexus. *Johnson v. Piggly Wiggly of Pinetops, Inc.*, 156 N.C. App. 42, 52, 575 S.E.2d 797, 804 (2003).

"[The Supreme] Court has allowed 'could' or 'might' expert testimony as probative and competent evidence to prove causation." *Young v. Hickory Bus. Furniture*, 353 N.C. 227, 233, 538 S.E.2d 912, 916 (2000). However, " 'could' or 'might' expert testimony [is] insufficient to support a causal connection when there is additional evidence or testimony showing the expert's opinion to be a guess or mere speculation." *Id.* (citing *Maharias v. Weathers Bros. Moving & Storage Co.*, 257 N.C. 767, 767-68, 127 S.E.2d 548, 549 (1962)). An expert witness' testimony is insufficient to establish causation where the expert witness is unable to express an opinion to "any degree of medical certainty" as to the cause of an illness. *Id.* Likewise, where an expert witness expressly bases his opinion as to causation of a complex medical condition solely on the maxim *post hoc ergo propter hoc* (after it, therefore because of it), the witness provides insufficient evidence of causation. *Id.* at 232-233; 538 S.E.2d at 916.

In *Holley*, our Supreme Court discussed expert testimony which it found insufficient to establish causation because such testimony suggested "that a causal connection between plaintiff's accident and her [injury] was possible, but unlikely." *Holley*, at 233-34, 581 S.E.2d at 753-54. *Holley* involved an employee who felt a sudden pain in her left calf after twisting her leg at work. She was subsequently diagnosed with a pulled calf muscle. *Id.* Approximately six weeks later, the employee developed a painful, swollen leg. She was diagnosed with deep vein thrombosis ("DVT"), a condition caused by a blood clot in a deep vein that obstructed blood flow and caused inflammation. *Id.* at 233, 581 S.E.2d at 751. The issue presented to the Court

---

2. Moreover, the causal relationship must be established by evidence "such as to take the case out of the realm of conjecture and remote possibility." *Holley*, 357 N.C. at 232, 581 S.E.2d at 753.

was the sufficiency of the evidence regarding the cause of the employee's DVT. *Id.* Although two physicians testified that it was possible that her DVT was caused by her earlier accident, neither physician could testify to a reasonable degree of medical certainty that a plaintiff's injury had been caused by an accident at work. *Id.* One doctor testified that he thought there was a "low possibility" that the plaintiff's injury had been caused by the accident at work, that the plaintiff could have been developing the problem prior to the incident at work, and that, given plaintiff's medical history, the cause of the plaintiff's injuries was "just a galaxy of possibilities." *Id.* The other doctor stated the following on cross-examination: "I don't really know what caused the [injury]." *Id.* Given this equivocal expert testimony and evidence that plaintiff's medical history made her susceptible to developing DVT in the absence of the accident at work, the Court concluded that causation had not been established. *Id.*

Following *Holley*, this Court decided the case of *Hodgin*, which involved a carpet layer who alleged that he suffered a paraesophageal hernia as a direct result of lifting an unusually heavy chest of drawers while at work. *Hodgin*, 159 N.C. App. at 636, 583 S.E.2d at 363. There was evidence before the Commission that plaintiff had experienced possible symptoms before the incident at work. *Id.* One physician testified that the episode at work "could have been related to the plaintiff-employee's paraesophageal hernia," but noted that paraesophageal hernias can be asymptomatic for extended periods and chest pains are only symptomatic of the condition. *Id.* at 641, 583 S.E.2d at 366. Another doctor testified that paraesophageal hernias can be asymptomatic for some time such that there was no way of knowing exactly when the plaintiff-employee's paraesophageal hernia appeared without X-rays taken before and after the appearance of symptoms. *Id.* at 642, 583 S.E.2d at 366-67. Because the medical testimony before the Commission tended to establish that a paraesphogeal hernia is difficult to diagnose, that it was possible that plaintiff already had such a condition and that, at best, plaintiff's hernia *could possibly have been caused* by the incident at work, we reversed the Commission's award on the ground that causation was lacking. *Id.* at 642, 583 S.E.2d at 367. In reaching this decision, we observed that, while speculation may play an important role in patient diagnosis, it is not alone sufficient to establish legal causation: "Our Supreme Court has recognized that although physicians "are trained not to rule out medical possibilities no matter how remote[,] . . . mere possibility has never been legally competent to

prove causation." *Id.* at 640, 583 S.E.2d at 366 (quoting *Holley*, 357 N.C. at 233, 581 S.E.2d at 751).

In the instant case, the only medical deposition testimony offered into evidence was the testimony of Dr. Kritzer taken on 7 March 2002. Dr. Kritzer's deposition transcript on direct examination reads in pertinent part:

Q. Now, Dr. Kritzer, did you have an occasion to treat [plaintiff]?

A. Yes, I did.

Q. And did you see [plaintiff] for the first time on March the 13th, 2001?

A. I did.

Q. And did you take a history from [plaintiff] at that time?

A. I did.

Q. And what history did you take from him, sir?

A. He reported falling off a ladder at work approximately six months prior to that, to the date given, was around October 1st of 2000. Fell off a ladder at work and hurting his back at that time.

Q. And what were his subjective complaints during that visit?

A. Pain in his left buttock, hip, and leg, with numbness and tingling.

Q. Okay. And did he bring an MRI with him [to] you or an MRI report with him?

A. Yes, he did.

Q. Okay. Did you have an opportunity to review that MRI report?

A. Yes.

Q. And what were your—

A. I didn't review the report, I reviewed the films.

Q. Okay. And what were your—

A. And it showed a large disk herniation at L5-S1 on his left side.

ADAMS v. METALS USA

[168 N.C. App. 469 (2005)]

Q. Okay. And would that L5-S1 disk herniation be consistent wit the leg numbness and complaints that [plaintiff] presented to you on March 13th, 2001?

A. Yes—yes, it would be.

Q. And just as a general background, what type of symptoms manifest themselves from an L5-S1 disk herniation?

A. Pain in the buttock, hip, and leg, with numbness and tingling, just like [plaintiff] had.

Q. Now, in your treatment of [plaintiff] would it be important to your treatment that before falling off the ladder on October 1st, 200[0] he didn't have any back or leg pain?

. . .

A. Yes, it would be important that he did not have a previous history.

Q. And would it be significant to your treatment that after October 1st, 2000 that [plaintiff] did start complaining of leg and hip numbness and tingling and pain and discomfort?

A. Yes.

Q. Now, Dr. Kritzer, if the Industrial Commission were to find that [plaintiff] fell off a ladder on October 1st, 2000 and landed on his back, do you have an opinion whether that incident caused his disk herniation at L5-S1?

. . .

[Dr. Kritzer]: The—all you can say is that his symptoms started then, and that's really the main issue, temporally speaking. And he don't have to fall [off] a ladder to rupture a disk. People can do it in their sleep, can do it emptying a dishwasher. It does not have to be some sort of big event. But if he was asymptomatic before he fell off and then developed symptoms after he fell off, then **I would certainly believe that the falling off the ladder was the cause of his difficulty**.

(emphasis added).

Dr. Kritzer's deposition transcript on cross-examination reads in pertinent part:

ADAMS v. METALS USA

[168 N.C. App. 469 (2005)]

Q. . . .Would you expect pain to occur at the time of a disk herniation?

A. No, do not have to.

Q. Okay. What about some of symptoms, radicular pain, radicular symptoms—

A. Not necessarily. When someone comes in and they have a ruptured disk and they say they've had a problem for three weeks, that doesn't mean that three weeks earlier from that date is when that disk came popping out. You can have a disk rupture—I always kind of make the analogy of walking around with a knife in your pocket, okay. I can have a knife in my pocket and not have any problems from it, but if somehow I twisted or banged into a wall or fell down and that knife stabs me, then I start to have difficulty. So you cannot necessarily equate the weight of symptoms with the exact date of herniation . . . .

Q. Okay. If you'll assume for a moment—can coughing and sneezing cause a herniated disk?

A. It can.

Q. Can everyday activities cause a herniated disk?

A. Yes.

Q. Have you seen cases in which you cannot point to a specific traumatic event as the cause of a herniated disk?

A. Yes, very many.

Q. Your opinion you stated regarding causation was based upon the temporal nature of the complaint and the fall?

A. Yes.

Q. His history he gave to you was that he had these pain[s] and symptoms after he fell, correct?

A. Correct.

Q. Was it your understanding that he had it immediately after he fell?

A. Well, he said he had it minor for about two or three months and then it started to get a lot worse. That was the original history that he gave me.

ADAMS v. METALS USA

[168 N.C. App. 469 (2005)]

Q. Okay.

A. But he did have some difficulty immediately after [the fall].

. . .

Q. I'm sorry. If you'll assume for a moment that in October— and again just assume that the Commission finds these facts.

A. Okay.

Q. That in October of 2000 [plaintiff] slipped from a low rung of a ladder and scraped his arms; that he did not complain of any symptoms in his back, no pain or radiculopathy, continued working for three and half months in his normal job, during which he never asked to see a doctor, never told his supervisors that he was having any problems with his back; the first time he saw a doctor was in mid-January of 2001, three and half months after the fall from the low rung on the ladder, at which time he was sneezing and coughing because he was sick.

If you'll assume those facts, would you [be] able to tell us, to a reasonable degree of medical certainty, that falling a couple of feet from the ladder caused the herniated disk?

A. No, I would not be able to say that with reasonable medical certainty.

Q. Okay. And I guess the opinion you gave previously was based upon the temporal nature of the pain and the fall?

A. That's correct.

Dr. Kritzer's deposition transcript on redirect reads in pertinent part:

Q. Now, Doctor, just one or two follow-up questions. Was there any indication in your treatment of [plaintiff] that sneezing or coughing or everyday activities caused his disk herniation at L5-S1?

A. No.

Q. And would it be significant as well that after October 1st, 2000, [plaintiff] complained of problems going down his leg into his feet?

A. I'm sorry, repeat that question.

Q. Excuse me. Would it be significant that after his fall on October 1st, 2000 that [plaintiff] complained of having problems going down his leg and into his feet?

. . .

A. [Dr. Kritzer]: That would be significant.

. . .

Q. Your opinion on causation is based upon the history given to you in this case, correct?

A. Correct.

The record shows that plaintiff complained of pain in his left hip and leg, and numbness and tingling in his feet—which evidence is consistent with the testimony of Dr. Kritzer that a left herniation would cause problems on the left side down into the legs. The medical records in evidence objectively verify a disk herniation, based an MRI scan as of 7 February 2001. In addition, Dr. Kritzer testified he relied on the medical records in rendering his decision. *See* N.C.G.S. § 8C-1, Rule 703 (2003) ("The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.").

In the instant case, the evidence was sufficient to allow the Commission to determine that the accident at work caused plaintiff's injury. Although Dr. Kritzer testified that he could not opine to a reasonable degree of medical certainty whether the fall from the ladder caused plaintiff's back injury, testimony attesting "medical certainty is not required." *Holley*, 357 N.C. at 234, 581 S.E.2d at 754. Dr. Kritzer also testified that "if [plaintiff] was asymptomatic before he fell off and then developed symptoms after he fell off, then I would certainly believe that the falling off the ladder was the cause of his difficulty." The doctor further testified that the development with plaintiff's symptoms was consistent with the injury occurring from the fall and that, although a disc herniation can be caused by everyday activities, he had no indication that everyday activities caused plaintiff's disc herniation. This testimony, combined with the additional evidence in the case, including the history and medical testimony, provided competent record evidence which supports the Commission's finding with respect to causation.

The fact that the treating physician in this case could not state with reasonable medical certainty that plaintiff's accident caused his disability, is not dispositive—the degree of the doctor's certainty goes to the weight of his testimony. *Martin v. Martin Brothers Grading*, 158 N.C. App. 503, 507-08, 581 S.E.2d 85, 88 (2003). The decision concerning what weight to give expert evidence is a duty for the Commission and not this Court. *See Adams*, 349 N.C. at 681, 509 S.E.2d at 414. The dissent's suggestion that we consider the "greater weight" of the evidence is a suggestion that this Court adopt the duty of weighing the evidence. As compelled by statute, weighing of the evidence is not our function. *See* N.C.G.S. § 97-86 (2003) ("The award of the Industrial Commission . . . shall be conclusive and binding as to all questions of fact"); *Deese v. Champion Int'l Corp.*, 352 N.C. 109, 530 S.E.2d 549 (2000) ("[I]f the commission's conclusions are otherwise supported by competent evidence, the [C]ourt may not scrutinize the commission's reasons for believing a witness while engaged in its fact-finding role and overturn its decision on the basis of those reasons."). Since there exists competent evidence that plaintiff's work injury proximately caused his disability, this assignment of error is overruled.

II

**[2]** Second, defendants argue that there existed insufficient evidence to prove ongoing disability.

Disability under the Workers' Compensation Act is defined as "incapacity because of injury to earn the wages which the employee was receiving at the time of injury in the same or any other employment." N.C.G.S. § 97-2(9) (2003). The burden of proving the extent and degree of disability lies with the plaintiff. *Simmons v. Kroger Co.*, 117 N.C. App. 440, 442, 451 S.E.2d 12, 14 (1994). The plaintiff may meet this burden in one of four ways:

(1) the production of medical evidence that he is physically or mentally, as a consequence of the work related injury, incapable of work in any employment; (2) the production of evidence that he is capable of some work, but that he has, after a reasonable effort on his part, been unsuccessful in his effort to obtain employment; (3) the production of evidence that he is capable of some work but that it would be futile because of preexisting conditions, i.e., age, inexperience, lack of education, to seek other employment; or (4) the production of evidence that he has

obtained other employment at a wage less than that earned prior to the injury.

*Russell v. Lowes Product Distribution,* 108 N.C. App. 762, 765, 425 S.E.2d 454, 457 (1993); *see also Simmons,* 117 N.C. App. at 442-43, 451 S.E.2d at 14. Once the plaintiff establishes disability, there is a presumption that the disability continues until he returns to work at wages equal to those he was receiving at the time of his injury. *Simmons,* 117 N.C. App. at 443, 451 S.E.2d at 14.

In the instant case, plaintiff testified that he was released from Dr. Kritzer's care with a permanent partial disability rating of eleven percent (11%) as to his back, and a lifting restriction of fifty pounds. At the time plaintiff was released to return to work, defendant-employer had terminated his position. Moreover, defendant-employer never offered plaintiff any light duty work or vocational rehabilitation assistance.

From the evidence presented, it appears plaintiff was still currently disabled as he had not yet regained his pre-injury wage capacity. *Radica v. Carolina Mills,* 113 N.C. App. 440, 447, 439 S.E.2d 185, 190 (1994) ("[a]n employee's release to return to work is not the equivalent of a finding that the employee is able to earn the same wage earned prior to the injury"). Plaintiff had worked as a truck loader for several years and has few transferable skills and limited education; defendants have not shown suitable employment opportunities are available to plaintiff; and plaintiff testified that he searched for employment but was unsuccessful. *See Foster v. U.S. Airways, Inc.,* 149 N.C. App. 913, 918, 563 S.E.2d 235, 239 (stating an employer may rebut the presumption of ongoing disability "by showing that suitable jobs are available, taking into consideration the employee's physical and vocational limitations, and taking into consideration whether the employee is capable of obtaining a suitable job"), *disc. review denied,* 356 N.C. 299, 570 S.E.2d 505 (2002). Based on evidence that plaintiff has not yet returned to pre-injury wages, nor has he refused suitable employment, this assignment of error is overruled.

Affirmed.

Judge LEVINSON concurs.

Judge TYSON dissents in a separate opinion.

TYSON, Judge dissenting.

The majority's opinion holds that Dr. Kritzer's testimony suffi-ciently established causation to affirm the Commission's award. I respectfully dissent.

"Plaintiff has the burden to prove each element of compensabil-ity." *Holley v. ACTS, Inc.*, 357 N.C. 228, 234, 581 S.E.2d 750, 754 (2003) (citing *Harvey v. Raleigh Police Dep't*, 96 N.C. App. 28, 35, 384 S.E.2d 549, 553, *disc. rev. denied*, 325 N.C. 706, 388 S.E.2d 454 (1989); *Taylor v. Twin City Club*, 260 N.C. 435, 437, 132 S.E.2d 865, 867 (1963)). "[T]he plaintiff must prove that the accident was a causal factor by a 'preponderance of the evidence.' " *Holley*, 357 N.C. at 232, 581 S.E.2d at 752 (quoting *Ballenger v. ITT Grinnell Indus. Piping, Inc.*, 320 N.C. 155, 158-59, 357 S.E.2d 683, 685 (1987), and citing 1 Kenneth S. Broun, *Brandis and Broun on North Carolina Evidence* § 41, at 137 (5th ed. 1998)). With injuries involving complex medical questions:

> "only an expert can give competent opinion evidence as to the cause of the injury." *Click v. Pilot Freight Carriers, Inc.*, 300 N.C. 164, 167, 265 S.E.2d 389, 391 (1980). "However, when such expert opinion testimony is based merely upon speculation and conjec-ture, . . . it is not sufficiently reliable to qualify as competent evi-dence on issues of medical causation." *Young v. Hickory Bus. Furn.*, 353 N.C. 227, 230, 538 S.E.2d 912, 915 (2000). "The evi-dence must be such as to take the case out of the realm of con-jecture and remote possibility, that is, there must be sufficient competent evidence tending to show a proximate causal rela-tion." *Gilmore v. Hoke Cty. Bd. of Educ.*, 222 N.C. 358, 365, 23 S.E.2d 292, 296 (1942) . . . .

*Holley*, 357 N.C. at 232, 581 S.E.2d at 753.

In *Holley*, our Supreme Court clarified the employee's burden and the required standard of proof to establish causation and stated, "[a]lthough expert testimony as to the *possible* cause of a medical condition is admissible if helpful to the jury, it is insufficient to prove causation, particularly 'when there is additional evidence or testi-mony showing the expert's opinion to be a guess or mere specula-tion.' " 357 N.C. at 233, 581 S.E.2d at 753 (quoting *Young*, 353 N.C. at 233, 538 S.E.2d at 916) (internal citation omitted). In reversing this Court's majority opinion, which had affirmed the Commission's finding of compensability, our Supreme Court held, "the entirety of causation evidence before the Commission failed to meet the reason-

able degree of medical certainty standard necessary to establish a causal link between plaintiff's . . . injury and her [disease]." *Holley*, 357 N.C. at 234, 581 S.E.2d at 754.

Here, Dr. Kritzer was the *only* medical expert whose testimony was considered by the Commission. He testified that plaintiff's injury could have been caused by "emptying a dishwasher," "in [his] sleep," or "coughing and sneezing." Dr. Kritzer also stated he could not testify to a "reasonable degree of medical certainty" that plaintiff's "falling a couple of feet from the ladder caused the herniated disk." Further, Dr. Kritzer did not review "any previous medical history" from plaintiff, other than plaintiff's "account" of the accident and an MRI film. Dr. Kritzer's only basis for causation was admittedly based on "the temporal nature of the pain and the fall." The "entirety of causation evidence" fails to establish plaintiff's fall off the ladder caused his back injury. *Id.*

Dr. Kritzer's deposition and testimony show that numerous possible causes of plaintiff's injury exist. His opinion regarding the cause of plaintiff's injury was based on the "history" given to him regarding plaintiff's injury and the "temporal nature of the complaint and the fall." Although Dr. Kritzer's testimony may be admissible, it was based on "mere speculation" and is "insufficient to prove causation." *Id.* at 233, 581 S.E.2d at 753.

To support its holding that plaintiff presented sufficient evidence regarding causation, the majority's opinion relies in part on *Johnson v. Piggly Wiggly of Pinetops, Inc.*, 156 N.C. App. 42, 575 S.E.2d 797 (2003), which was decided by this Court prior to the Supreme Court's decision in *Holley*. Further, this Court's majority opinion in *Holley v. ACTS, Inc.*, relied on *Johnson* and was reversed by our Supreme Court. *See Holley v. ACTS, Inc.*, 152 N.C. App. 369, 567 S.E.2d 457 (2002), *rev'd*, 357 N.C. 228, 581 S.E.2d 750 (2003). Reliance on this case as precedential authority was rejected by the Supreme Court in *Holley* and the majority's opinion fails to apply the proper standard. *Id.* We are bound by the decisions of our Supreme Court. *See Dunn v. Pate*, 334 N.C. 115, 118, 431 S.E.2d 178, 180 (1993) (noting the Court of Appeals is bound by decisions of the Supreme Court).

Even accepting the majority's interpretation of *Holley* that expert testimony to a "reasonable degree of medical certainty" is not required to prove causation, *no* competent evidence exists to support the Commission's finding that "plaintiff's [injury] was causally related to his October 1, 2000[,] fall from the ladder." Dr. Kritzer, the sole

expert, testified to numerous possible causes of plaintiff's injury. Dr. Kritzer's opinion, based solely on temporal proximity and "plaintiff's account," does not constitute competent evidence of causation. His opinion is speculation and conjecture, which *we all agree* is insufficient under *Holley*. 357 N.C. at 232, 581 S.E.2d at 752.

Without competent evidence to support a finding of fact to prove the required element of causation, the Commission's conclusion of law that "Plaintiff suffered a compensable injury" cannot be supported. The Opinion and Award should be reversed. I respectfully dissent.